B.H.C. Northwest Psychiatric Hospital, LLC, B.B.A. Brooklyn Behavioral Hospital Petitioner v. Secretary of Labor. The Senator for the Petitioner, Mr. Dewey, is the respondent. Good morning. May it please the Court, I'm Carla Gunnan. I am representing the petitioner in this case, B.H.C. Northwest Psychiatric Hospital, doing business in Brooklyn. This hospital is in the business of treating psychiatric patients. These are patients who are under acute crisis and are required to be in a locked psychiatric facility. As such, this hospital does have protocols in place to manage these patients. The issue in this case does not have to do with recognition of the hazard. This hospital recognized the hazard in this case, and it is actually the core of their business to handle patients who are aggressive and potentially aggressive to staff at the hospital. As such, there were protocols, there was tracking and trending of the protocols, there had been evidence put into court that demonstrated that looking at the overall aggression that was occurring at the hospital had actually reduced over a three-year time period. That is the piece of evidence that was submitted in this case. The issue in this case comes down to the question of feasibility of abatement. This is not a case similar to a case that was heard by this Court many years ago, the Secretary of Labor and C-Roll case, wherein the question in that case really came down to recognition of a hazard. I would ask the Court to distinguish this particular circumstance. In this case, we have a situation of feasibility of a hazard, and that comes down to two subparts. It's not only that the Secretary of Labor must prove what is feasible, but in a case like this, where there is no ability to completely eliminate the hazard, the question is, what is the material reduction of the hazard? And it is a fundamental question that we believe goes to the notion of due process and fair notice. The reason why we believe that this is such an important issue in this case, it goes to the applicability of the General Duty Clause to all employers. If you're an employer and you cannot fully eliminate a hazard, then you must know what is compliance with the Occupational Safety and Health Act and what is the material reduction. So there's two components to feasibility of a hazard. One, it is completely eliminated. Oftentimes in these cases, similar to the case that this Court heard in C-World, the hazard had been eliminated as agreed upon by the Secretary of Labor and the party in that case. In this case, the experts have agreed there is no ability to fully eliminate this hazard. The question then becomes, if we cannot eliminate, what must we do? There are multiple options that have been provided by the Secretary of Labor for means to... Yes, Your Honor. May you repeat that question, please? The question is, did the hospital do enough to abate the risk? Yes, Your Honor. Isn't that just a fact question? Your Honor, I would say that it is not absolutely a fact question. And I would like to give a scenario that I actually laid out in the briefing of this case. To me, the situation is very similar to if you were driving down a road and there is no speed limit posted on that road. And every day there is a different police officer monitoring that road. And every day they are stopping traffic and they are determining what the speed limit is for that day. The facts here cannot shift. For there to be fair notice and due process to an employer, they must know what is the speed limit. That is the question. I appreciate the hypothetical because it did help me think about the general duty clause, which is general. Yes, Your Honor. And I recognize the conundrum that an employer has in trying to figure out what to do. But I think the analogy might, the more apt analogy might be a prohibition against reckless driving. And if somebody is, I mean, you don't chapter and verse sort of say, you know, how many people can have fatal accidents or accidents that result in serious bodily harm. But we have kinds of training and guidelines that give people notice in context what's reckless and what's not. And if an employer fails to have the appropriate kinds of training and guidelines or has them and doesn't implement them, which I read to be the basis of a lot of the basis of the decision here, then that constitutes a violation. So I think a lot of the question here was whether policies that were on the books were actually used to their intended effect. Yes, Your Honor. And I think that is a good point. But I would say that the hospital actually provided evidence in the trial of this matter where they had tracked and trended the reduction of overall aggression at the facility. That aggression included patient aggression to staff. It was a key piece of evidence that actually in the court below, it was glossed over. And quite frankly, ignored in the decision. But the hospital was looking at that. So for the hospital, they were looking at it and saying, we have protocols. We are implementing these. We believe we are successfully reducing this hazard in the hospital. What standard of review was the court supposed to apply to the administrative decision? Your Honor, for the review, it would be substantial evidence review. And, Your Honor, I It takes it back to Judge Kansas' question. Isn't it really just a fact question? Your Honor, I think it actually goes more to the fundamental notion of fair notice and due process. Because I think that if you look at facts, the facts are always shifting for an employer to know whether or not they've complied. And I think that the issue here There are two separate issues, right? One is, does it violate due process to have a rule that says you must feasibly debate risk? Yes, Your Honor. Which is like Judge Pillard's hypothetical about reckless driving. Yes, Your Honor. And I think that that is And that's a tough argument for you. But once we get past that, the only other question is, there was a finding adverse to your client about feasible abatement, and we're just reviewing that for substantial evidence. Yes, Your Honor. And I think that there still contains the notion of fair notice and due process. Because if you are in a situation that is very unusual, under the use of the general duty clause, courts have not looked at the issue of when you cannot eliminate a hazard, what is the material reduction? And I think that makes the fundamental difference in this case. Because the judge ruled in the court below that the secretary does not need to provide that notice to the regulatory community. Would it violate due process to enact the reckless driving statute? Well, I think, Your Honor Nobody knows I think, Your Honor, to that point, if there was actually a notice of comment and a rule made, then I think actually that would be the process that should be used in this particular case. I think there is a question The rule just says don't drive recklessly. And someone says, well, I don't know if that's 65 or 70 or I think Your Honor makes a good point. If it says reckless, what is reckless? Yeah, but every state I'm familiar with has a reckless driving statute. I don't know that any of them have been tested for the due process analysis you want, but none of them have been found unconstitutional in that notice. But Your Honor, I don't know that reckless driving would mean that you only drive five miles over and that's reckless. I think that generally they give a little bit more definition with respect to what reckless is. I was a traffic court judge, you know. And I don't remember any more definition than that. I found many a person. Maybe I violated their due process rights. The officer would describe what the person did and the person would say I didn't do that or something. And if we found them, we found them. But there wasn't a lot more definition. Your Honors, I was actually going to reserve some time for rebuttal. We'll give you some time. OK. Should I continue or should I stop? I'm good. Yeah, I think you should sit down and we'll give you a couple of minutes. OK, thank you for the rebuttal. Good morning, Your Honors, and may it please the Court. I'm Anne Godoy on behalf of the Secretary of Labor. In the face of a known workplace violence hazard, Brooklyn didn't do nearly enough to protect its employees from patient attacks. It was well aware that it needed to do more. Brooklyn's claims to the contrary simply are not credible. Workplace violence at Brooklyn Hospital was rampant. In 2016, the year of OSHA's inspection, Brooklyn's own records, which don't even capture all incidents of workplace violence, show 51 employee injuries due to patient on-staff attacks. Employees who testified at the hearing described being spit on, bitten, punched, kicked, and thrown into walls. And ALJ found that these types of violent attacks routinely occurred. Even UHS, which is Brooklyn's parent company, notified the hospital that its employee injury rate was too high. The ALJ methodically explained why Brooklyn's efforts were insufficient, and Brooklyn hasn't meaningfully challenged any of these factual findings. The evidence in the record shows that Brooklyn repeatedly failed to implement even its own policies on paper. One of the most glaring deficiencies in its approach is what the OSHA's expert described as its haphazard and archaic approach to summoning help in an emergency. So while Brooklyn had a Code 100 policy on paper, the evidence in the record shows that in practice, this policy was completely ineffective. Employees... Ms. Godoy, how would you articulate the standard that you believe applies to determining whether there's a violation of the general duty clause? I understand it's not community standards, what the hospitals are typically doing. How would you articulate what you think we should apply? In national realty, this court said that the operative question is what is feasible for an employer to eliminate or materially reduce the hazard? And here, the evidence in the record and the judge's finding is that there are a number of feasible steps that Brooklyn could have taken to reduce the hazard. There's also some language in our cases about what a reasonably prudent employer familiar with the circumstances would have done. How do you mesh that with the national realty? Is it feasible? So going to the notice question of whether a reason... In SeaWorld, this court said that there's no notice issue with the general duty clause when it's applied, and a reasonably prudent employer in the industry would have known that the abatement was required. So the reasonably prudent employer centered, as you understand the scheme, goes to what comprises notice, not how you respond to it. Correct. But I think what is reasonable for an employer in industry is not necessarily what the industry standard is also. I understand that. Yeah. You mentioned the numbers, but I also took you to be saying that actually the raw numbers are not that illuminative because you could... Are illuminating because you could have, you know, one year, a handful of patients who are particularly dangerous, or another year... You know, it really depends on the circumstances, just like reckless driving. If there are more icy days, you know, or more people driving more miles, it's going to affect the rate. So how does the secretary treat rates from year to year of injury or death? I think the rates are very relevant, and, you know, the evidence in the record shows that patient-on-staff assaults were rampant, but the data that Brooklyn points to to show that it reduced its patient-on-staff attacks is incomplete. That data doesn't capture all incidents of workplace violence. It includes things that aren't workplace violence at all, such as patients damaging property. So the data that they point to to show that they've actually reduced patient-on-staff attacks doesn't tell the court anything about the true nature of violence. But I think your point that sometimes there may be patients that are more violent and an employer needs to do more to address that is well taken. And I think Brooklyn had some evidence that in 2016 there were a couple of patients that were particularly problematic, but there's no indication that they changed any policies or anything like that to deal with those problems. But I take your opposing party to be saying if the numbers are dropping, then that shows our policies are effective. What's your position on that? There's no evidence in the record that shows their numbers were dropping. If they were, how would you treat that? I think it might be indicative that they were taking some measures, but it doesn't answer the ultimate question of did they do everything that was feasible to materially reduce this hazard. As I was saying, the evidence in the record showed that they didn't even implement their own policies on paper. Employees are supposed to be able to use phones to call for help in an emergency, but the evidence shows that there were a limited number of phones available and there were no phones in a number of areas where patients spent a lot of time and violent attacks frequently occurred. And employees were actually injured because of their inability to get help when they needed it. How do you respond to Ms. Gunn's point that it's hard for them to know of all the different abatement measures that are proposed, are they all required? Are they alternative? What's the Secretary's position on that? The General Duty Clause requires employers to abate the hazard to the extent feasible. The Secretary's burden is to identify feasible methods for the employer to do that, and that's exactly what the Secretary did in this case. OSHA's expert identified six measures that together would materially reduce the hazard to the extent feasible, but those measures are not binding in any way on the employer. Brooklyn could implement other comparable measures that would be just as effective to reduce the hazard. But there is extensive evidence in the record that these measures were well-known. They had been written about, discussed in the field for years. There are a number of studies discussing these abatement measures and their effectiveness, so there's really no reason for Brooklyn to be unaware of the measures that were needed to be taken in this situation. So in more pointed answer to her question, how do they know? I mean, you know, they're running a business, and these measures are, each of them has a cost. Training costs, implementation costs, equipment costs. How do they know where to draw the line? There is some unavoidable level of risk, and so they're having to make some kind of judgment. How do they know where to draw the line? I mean, on this record, obviously we have a great deal of deference to the agency, but in general going forward, employers are looking for guidance. Right. Well, there is extensive guidance from OSHA, from NIOSH, the National Institute of Occupational Safety and Health, from professional health care associations, measures that can be taken to reduce the hazard. But one of the abatement measures that OSHA identified here, and even that Brooklyn's own expert considered a best practice, is to implement a comprehensive hazard evaluation. And this would enable the employer to be consistently monitoring for workplace violence incidents in their hospital, and determining whether there are any additional steps that could be taken to address the hazard. So that process-based approach would enable the employer to know whether there were more steps that could be taken to address the hazard. That's helpful. There, as the judge found, substantial evidence, or substantial evidence supports the judge's finding that there are these six different abatement measures that could materially reduce the hazard. And, in fact, Brooklyn has actually implemented a number of these measures since the issuance of the citation. They've addressed some of their staffing issues by hiring a security mental health technician. This is somebody who doesn't have any patient care responsibilities and can respond to codes when they're called. They've hired another staff member who ensures that the walkie-talkies are all working at all times. So these are really straightforward and sensible measures that Brooklyn could take that almost certainly would have prevented some of the attacks on employees like Frederick Ginsburg, who was injured because he couldn't get help when he tried to call for it. And how do you respond to the dominant theme in Brooklyn's brief that HRI was in a very similar situation and the same ALJ ruled differently in that case? Comparison of these two decisions shows that these are very different programs, both on paper and in implementation. So, well, Brooklyn had a Code 100 policy for employees to call for help in an emergency. There was extensive evidence in the record that in practice employees couldn't get the help that they needed when patients were attacking. That evidence was not at all the case in HRI. In HRI they had a Code Green policy. We don't actually have what that policy is before us, but it was effective. There was no evidence that employees were unable to get the help that they needed when there was a psychiatric emergency situation. The training was different as well. There was a finding in this case that Brooklyn didn't provide the training on its PowerPoint to employees, but in HRI the employer did provide that training. I see that I'm out of time. Thank you very much. Your Honors, thank you for the rebuttal time. I would just like to note that the Secretary in their own recommended abatement methods and what becomes ultimately the judge's decision, they use words such as significantly improving or drastically improving. Using words such as drastically and significantly indicates that the Secretary conceded that there were efforts already being made by Brooklyn, but the standard has now become significantly or drastically. I think using words that are amorphous and without definition creates a very difficult thing for Brooklyn to know what do they do, what can they do more. And to say simply there is more that they can do without providing evidence of how that would actually materially reduce the situation leaves the employer with a fundamental lack of knowledge about what they can do to achieve this result. And even though the Secretary downplaced the evidence that was supplied about the reduction of aggression at the facility, they track aggression at the facility because overall aggression is important. If someone throws a bottle, if they break a chair, that is an aggressive act that could indicate that they are going to escalate and potentially do something to a staff member. It is important tracking and trending that they do to look to see what is the reduction of aggression overall at the facility. So I think that number was something that they did rely upon to say we do have policies in effect. The notion that there was no code policy is simply without merit in this case. What about the implementation? And a lot of what the ALJ pointed to was a range of shortfalls in policies that may have been implemented. People in important positions were not aware of them and didn't access them. So, Your Honor, I would like to address that briefly, and that is that I think that the ALJ did not pay attention to the testimony of the risk manager, Ann Hunter, at Brooklin. Comparatively, in the HRI case, the risk manager's testimony was looked at. The risk manager is actually the one in charge of tracking, trending, implementing the policies, looking at those issues. And to ignore her testimony, which she testified at length, and I briefed her testimony in the briefing, that's important. So I think that there is a distinction in the two cases because some testimony was,
judges: Pillard, Katsas, Sentelle